Trovato *v.* W. J. McCahan Sugar Refining
Company et al., Appellants.

Argued March 13, 1936.

Before Keller,
P. J., Cunningham, Baldrige, Parker, James and
Rhodes, JJ.

*Louis Wagner,* with him *Thomas J. Clary* and *Richard A. Smith,* for appellant.

*Philip A. Campbell,* with him *Victor Frey,* for appellee.

OPINION BY CUNNINGHAM, J., July 10, 1936:

For more than ten years prior to August 1, 1933, Ralph Trovato, claimant's husband, had been employed in the boiler room of the W. J. McCahan Sugar Refining Company. On that day he was promoted to the position of foreman of a shift which went on duty at three o'clock in the afternoon. Within half an hour after beginning work he suffered a heatstroke and was removed in an unconscious condition to Mt. Sinai Hospital where he died early the following morning.

The debatable question in the case is whether the heatstroke was attributable to the decedent's exposure to unusually high temperature during the course of his employment in the boiler room, or just as probably to the generally high temperature which had prevailed throughout the City of Philadelphia for several days and to which he had been exposed outside of the course of his employment. If the former, his death was compensable under the rulings of the Supreme Court in Lane v. Horn and Hardart B. Co., 261 Pa. 329, 104 A. 615, and of this court in Clancy v. Booth and Flinn Co., 109 Pa. Superior Ct. 452, 167 A. 393, and Consentino v. Union Paving Co., 113 Pa. Superior Ct. 295, 173 A. 470; if the latter, it was not compensable under our decision in Howey v. Peppard Bros. et al., 108 Pa. Superior Ct. 119, 164 A. 920.

1. There can be no serious controversy, under the circumstances present in this case, that the death of claim-

ant's husband was an "accident" within the intendment of our Workmen's Compensation Act of June 2, 1915, P. L. 736, and its amendments. It was not the natural, probable, and to be expected result of his voluntary exposure to the heat prevailing both inside and outside of the boiler room. In the Consentino case—where the death of the employee was caused by a sunstroke suffered during the course of his employment in road construction work—we endeavored to point out that such a death is compensable as distinguished from the death involved in the case of Lacey v. Washburn and Williams Co., 309 Pa. 574, 164 A. 724. There, the employee's death from pneumonia was the natural, probable, and usual consequence of his long and voluntary exposure to an extremely low temperature.

There was ample evidence in this case that the heat-stroke came upon the decedent suddenly and unexpectedly while he was at his work; the compensation authorities were, therefore, justified in concluding his death was caused by an "accident".

2. The next contention of appellants is that, under the evidence, "it is just as probable that the exposure to heat, causing prostration, occurred outside of the employment as that it occurred in the course thereof."

The referee and board awarded compensation, but, upon the employer's appeal to the common pleas, the record was remitted to the board with directions to make specific additional findings upon these questions:

"(a) Was the heatstroke suffered by the deceased caused in whole or in part by exposure to heat during the course of his employment?

"(b) If it was so caused, was such heat merely the general atmospheric condition to which all persons were then exposed or was it greater or additional heat arising out of his employment?"

Upon receipt of the record the board as then con-

stituted reviewed the testimony and made the following additional finding of fact:

"The board finds that the heatstroke suffered by deceased occurred wholly through exposure to heat during the hours of and in the course of his employment and that this heat was considerably greater than that in the general atmosphere outside, due to the increased temperature of the boilers whose maintenance it was deceased's duty to supervise."

Thereupon the court below dismissed the employer's exceptions to this finding and entered judgment upon the award. The present appeal is from that judgment and our only function is to determine whether there was sufficient legally competent evidence to sustain the finding, and whether the law has been properly applied thereto.

Uncontroverted facts appearing upon the record may be thus summarized: Decedent was a healthy man forty-two years of age and weighing about 210 pounds. His duties in the boiler room were thus described by a fellow workman who had been employed there for twenty-five years: "Watch the water and watch the fires, and walking up and down all the time watching the gauge." Decedent's death occurred during a period of unusually high temperature and during which deaths from heatstroke reached an unusually high percentage, but there was no direct evidence that he had been affected in any way until after entering upon the duties of his employment on the afternoon of Tuesday, August 1, 1933. On that day the outside temperature ranged from 81° to 97°. Decedent had worked on Saturday night, July 29th, and, with his wife, had spent Sunday at Atlantic City returning about half past ten that night. On Monday, July 31st, he worked in the boiler room from six o'clock in the morning until 6:45 in the evening, when the maximum outside temperature was 99°. His next period of duty began at three o'clock on

Tuesday afternoon. He left his home about a quarter after two, when, according to the testimony of his wife, "he looked perfect." In going to work he travelled by trolley to within half a mile of the plant and walked the remaining distance, arriving at the plant about fifteen minutes before three. Several of his fellow workmen to whom he talked after reaching the plant and as they were beginning their duties testified he then "looked all right." Nor is there any evidence of anything unusual about his appearance or actions until about a quarter past three, when, in the language of the witness Tony Rajchel, "Ralph told me he don't feel much good today, too much heat, and in a few minutes he walked outside, Ralph did, and he came back in a few minutes again and stayed maybe ten or fifteen minutes, and went out again, walked outside, and this time he no come back."

Another witness, Aleck Markowitz, related that before decedent went out of the boiler room the second time he told the witness "he felt funny" and asked him to get him some tea, but by the time he brought the water for the tea decedent had left the boiler room. The course of events was then taken up by a witness, Harry Wilson, who testified he saw the decedent sitting on the fire escape erected on the outside wall of the old boiler house, and continued: "I saw him sitting there, and I went down to see what was the matter with him, and he starts to get up and he staggers along awhile, and I got hold of him and started to question him but he couldn't speak, and I walked him up the yard to the time office." Decedent was then taken to the hospital in a taxicab, arriving there about four o'clock.

This brings us to an examination of the evidence upon which claimant relies to support the controlling finding of the board. We think she had the burden of showing, at least, that the heatstroke was most probably attributable to the high temperature to which her husband

was exposed after arriving at the premises of his employer and entering upon the performance of his duties.

There was no direct evidence of the temperature and humidity prevailing in the boiler room that afternoon, but there was testimony from which an inference could reasonably be drawn that the temperature in the boiler room was higher than that prevailing upon the outside. One of the decedent's fellow workmen, Robert Nochereva, testified upon this subject: "Q. What was the temperature of the boiler room—what was the heat in the boiler room? A. Pretty near a hundred—I can't tell. Q. Was it hotter in the boiler room than it was outside—was it more hot in the boiler room? A. Outside a little bit of wind was blowing and you could get fresh air, but boiler room you got little air from the windows—it is pretty hot work. Q. How many boilers are in that fire room? A. We were running at that time six or seven boilers. Q. How many of these boilers were coal burning boilers and how many were oil burning? A. That day we were running four oil burners and three coal burners—seven boilers."

Another member of the shift, Rajchel, said: "Q. How was the heat in that boiler room that day? A. Pretty good hot. Q. Taking it like the day before or two days before, was it worse or the same on this day. A. The same for three or four days. Q. Was it very hot on this day? A. Very hot. Q. Was it hot outside on that day? A. Hot outside too." A third fellow employee, Markowitz, testified: "Q. How was the heat or temperature of the boiler room that day? A. It was very hot . . . . . . Q. Was it greater than the day before? A. For me I think it was more hot. Q. Was it much more hot or a little more hot? A. I cannot tell that, but for me more hot." Henry Arns, foreman of the boiler house and called by the employer, described the fans and ventilating system installed therein. A question asked upon cross-examination, and his answer thereto, read: "Q. So

that it is usually a great deal hotter on the floor of that boiler room than it is outside the building? A. Sure—oh, yes."

Dr. A. M. Ornsteen, called by the employer, undertook, in answer to a hypothetical question, to differentiate between "heat exhaustion" and "heatstroke," saying, "It is my opinion that the man suffered heat exhaustion from the effects of heat over a long period rather than having suffered heatstroke from exposure to intense heat for a very short period on August 1st." At another place in his testimony he said, "But usually sunstroke or heatstroke causes an immediate loss of consciousness, with convulsions and rapid death." Upon cross-examination, however, this witness conceded the symptoms, as described in the hospital records and by the attending physician, indicated that claimant's husband suffered a heatstroke.

In the light of the testimony to which we have referred, we cannot say that the specific finding of the board, to the effect that the heat in the boiler room "was considerably greater than that in the general atmosphere outside," and that the fatal heatstroke was attributable to "exposure to heat during the hours of, and in the course of, [decedent's] employment," is not supported by competent evidence. Whether we would have reached the same conclusion is immaterial so long as there was sufficient evidence to sustain the finding of the board.

We also think the testimony in this case differentiates it from the case of Howey v. Peppard Bros., supra. In that case, a man, seventy-three years of age and employed as a night watchman by a contractor, walked two miles on a hot day to his work. Upon his arrival at his place of employment, he sat down on a box from which he later fell to the ground as the result of a fatal sunstroke. In the course of the opinion, our former President Judge, TREXLER, pointed out there was no evidence

that the decedent engaged in any activities for his employer after his arrival that evening and that there was "nothing in the case that shows [the sunstroke] was induced by any act of the decedent after he arrived at his place of work."

Here, there is uncontradicted evidence that Trovato was actively engaged in the performance of his duties when stricken. It is, of course, impossible to determine with absolute certainty whether the heatstroke occurred "wholly" through exposure to the heat present in the boiler room, but, in the absence of any evidence that decedent had been noticeably affected in any way by the outside temperature, we cannot say it is unreasonable to conclude that the exposure during the course of his employment was not only a marked contributory factor toward, but in all probability the direct cause of, the stroke.

Our conclusion is that there is sufficient evidence upon this record to sustain the award and the judgment entered thereon.

Judgment affirmed.